TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00370-CR






Ex parte Danish Sheikh






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT

NO. D-1-DC-05-301171, THE HONORABLE CHARLES F. BAIRD, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 A jury convicted Danish Sheikh of aggravated assault with a deadly weapon. See
Tex. Penal Code. Ann. § 22.02 (West 2011). After the return of the guilty verdict, the State and
Sheikh reached an agreement as to punishment. Pursuant to that agreement, the trial court sentenced
Sheikh to serve ten years in the Texas Department of Criminal Justice, but suspended imposition of
the sentence and placed him on community supervision for a period of five years. See Tex. Code
Crim. Proc. Ann. art. 42.12 (West Supp. 2012).

 Approximately one year later, Sheikh filed an application for writ of habeas corpus
pursuant to Article 11.072 of the Code of Criminal Procedure asserting four grounds for relief. See
id. art. 11.072, § 8 (West 2005). Subsequent to a four-day evidentiary hearing, Sheikh filed a
supplemental application asserting a fifth ground for relief. The district court granted habeas relief
on two of the five grounds upon which Sheikh sought relief and vacated the judgment of conviction.

 The State of Texas now appeals the district court's order granting habeas relief and
vacating Sheikh's judgment of conviction. See id., art. 44.01(k) (West Supp. 2012); Tex. R. App.
P. 31. Sheikh cross appeals the court's denial of habeas relief on the fourth ground for relief asserted
in his original application. See id. art. 11.072, § 8. For the reasons that follow, we reverse and
render in part, and affirm in part.


BACKGROUND

I. Facts of the Case

 In September of 2003, Beth Blaney, a student at the University of Texas, began dating
Danish Sheikh, a fellow student and one of the residents in her dorm. They dated for approximately
one year and nine months before Beth ended their difficult and sometimes violent relationship. 
Sheikh, however, was not ready to accept the end of their relationship. His behavior towards Beth
escalated, culminating in a series of assaults one weekend in May of 2005.

 On the evening of Friday, May 13, 2005, Sheikh forced his way into Beth's dorm
room, refusing to leave or allow her to leave or call for help. He grabbed her, pushed her, and
knocked her down to keep her from the door. He was irrational and screaming at her as he
confronted her about their relationship. He kept her up most of the night to discuss their relationship
and why she needed to give him another chance, even though Beth repeatedly asked him to leave so
she could study for a final exam she had the following day. The next morning, when Beth again tried
to make Sheikh leave, he responded with more violence: pushing her, hitting her, kicking her, and
eventually choking her as he pushed her against the wall of the bathroom in her dorm room. When
later recounting the strangulation incident to the jury, Beth described feeling pain, being unable to
breathe normally, becoming dizzy, and losing consciousness. She also told the jury that upon
waking up on the bathroom floor, she could not immediately remember what had happened and
discovered that she had urinated on herself during the strangulation.

 After the assault, Sheikh apologized to Beth and changed her clothes. He then helped
her to her futon bed so she could lie down. His helpful attitude did not last, however, as Sheikh
responded violently to a comment Beth made by again choking her. This choking episode,
fortunately, did not cause Beth to pass out, although her extremities felt tingly. Later that same day,
while the two were still in Beth's dorm room, Sheikh once again became upset with Beth and once
again choked her, this time pushing her down on the bed and wrapping an empty pillow case around
her neck. Sheikh stopped this strangulation before Beth lost consciousness.

 Because of Sheikh's assaults against her and refusal to allow her to leave, Beth was
unable to study for or take the final exam she had scheduled. Sheikh concocted an elaborate scheme
to excuse her absence and cover his abuse. He took her to her classroom and, while Beth waited
outside, explained to her professor that Beth had been in a car wreck. Then, to corroborate this lie,
he took Beth to the hospital where, in Sheikh's presence, she told the ER doctor, falsely, that she had
been in a minor car accident.

 After leaving the hospital, Sheikh drove Beth to a local diner where they had dinner. 
It was now the evening of Saturday, May 14, 2005. Upon leaving the restaurant, Sheikh drove them
to the parking garage adjacent to his apartment complex. After he parked the car in his assigned
parking space, the two remained in the car while Sheikh attempted yet again to convince Beth to give
him and their relationship another chance. When Beth refused, Sheikh once again reacted violently,
grabbing her and hitting her repeatedly while they were inside the car. Sheikh then drove the car out
of his parking spot and sped towards the top level of the parking garage. When he stopped on the
top level, Beth ran from the car. Sheikh pursued her and tackled her, causing her to fall face down
on the cement floor. He rolled Beth over, straddled her, and, once again, began strangling her. In
describing this strangulation to the jury, Beth indicated that this was the hardest Sheikh had strangled
her. She testified that he was squeezing her neck as hard as he could and also pushing down against
her neck, causing her a lot of pain. She described being unable to breathe, feeling weak and dizzy,
and getting blurry vision. Once again, Sheikh strangled Beth until she lost consciousness. When
Beth awoke on the cement floor of the parking garage, Sheikh was still straddling her and she could
not feel any part of her body. She was unable to speak or move at all. She could see that Sheikh was
slapping her face and hear him demanding that she wake up, but she could not feel his hand
striking her.

 Sheikh then dragged Beth's body back to the car and put her inside it. He drove back
down to his parking spot, removing her just before he parked in his space. He then began forcefully
escorting Beth, who was having difficulty walking, to his apartment. As he was pulling her towards
his apartment, his roommate arrived. When Sheikh's roommate approached them, Beth ducked
behind him attempting to seek help from him. The roommate, unfortunately, did not want to become
involved. He did, however, eventually convince Sheikh to go into their apartment and let Beth go
back to her dorm. When Sheikh went inside with his roommate, Beth hid behind a car in the parking
garage and called a friend for help.

 The friend picked Beth up and took her to the apartment of another friend where other
friends joined them. Beth's friends observed her injuries--multiple bruises on her neck consistent
with being strangled--and urged her to report the incident. Finally, in the early morning hours of
Sunday, May 15, 2005, Beth called her mother, who lived in Conroe, Texas, as well as the police. 
Beth's mother and stepfather traveled to Austin to pick her up. Beth's mom, a nurse, felt that she
needed to go to the hospital and took her to Huntsville Memorial Hospital where she worked. At
the hospital, Beth was treated in the emergency room by Dr. Michael Edwards who observed and
documented her injuries.

 The next morning, Monday, May 16, 2005, Beth returned to Austin and met with law
enforcement officers of the Austin Police Department's Domestic Violence Unit. She met with two
detectives as well as a victim services counselor who all saw her injuries.


II. Procedural Background

A. Trial Proceedings

 In September 2006, at the conclusion of a five-day trial, a jury convicted Sheikh of
aggravated assault with a deadly weapon for the strangulation assault he committed against Beth on
May 14, 2005 in the parking garage. The jury also returned an affirmative deadly weapon finding,
finding that Sheikh used his hands as a deadly weapon during the course of committing the assault. 
Subsequent to the return of the guilty verdict, the State and Sheikh reached an agreement as to
punishment. Pursuant to the punishment agreement, and with the State's consent, Sheik withdrew
his election to have the jury assess punishment. See Tex. Code Crim. Proc. Ann. art. 37.07, § 2(b)
(West Supp. 2012) (upon return of a finding guilty, the defendant may, with the consent of the
attorney for the State, change his election of who assesses punishment). Sheikh also waived his right
to appeal. The State agreed to recommend a suspended sentence. The negotiated punishment
agreement also included various agreed upon community supervision conditions. While not
specifically articulated as part of the agreement, the record reflects the understanding that the court
would omit the jury's deadly weapon finding. In accordance with the terms of the agreement, the
trial court assessed Sheikh's punishment at confinement in the Texas Department of Criminal Justice
for ten years but suspended the sentence and placed Sheikh on community supervision for a period
of five years.


B. Habeas Proceedings

 In October 2007, just over one year after being placed on community supervision,
Sheikh filed an application for writ of habeas corpus pursuant to article 11.072 of the Texas Code
of Criminal Procedure, asserting four grounds for relief. The trial court conducted an evidentiary
hearing over four days in June and July of 2009. Subsequent to the hearing, in October 2009, Sheikh
filed a second supplemental application for writ of habeas corpus asserting a fifth ground for relief. (1) 
In May 2010, the district court filed an order which included the court's findings of fact and
conclusions of law. The order granted habeas corpus relief on the first and fifth grounds asserted in
Sheikh's applications, denied relief as to the other three grounds, and vacated Sheikh's judgment of
conviction. Both the State and Sheikh filed timely notices of appeal.


C. Grounds for Habeas Corpus Relief

 In his original application for writ of habeas corpus, Sheikh asserted four grounds for
relief. Sheikh asserted a fifth ground in his supplemental application, filed subsequent to the
evidentiary hearing. The grounds relevant to this appeal are the first, fourth, and fifth grounds for
habeas relief.

 In his first ground for relief, Sheikh alleged that the State knowingly used the perjured
testimony of Dr. Michael Edwards, the treating physician in the hospital emergency room where
Beth went for medical care after the assault. Sheikh complained about five different statements
Dr. Edwards made during the course of his testimony at trial. The habeas court found that three of
the complained-of statements were false or misleading. The habeas court further found that only one
statement was material. This statement related to the doctor's testimony about having served as chief
of the Ben Taub emergency room, when in fact Dr. Edwards served as the chief surgical resident of
the emergency center. The habeas court found that this statement was favorable and material and
granted relief on this first ground.

 In his fourth ground for relief, Sheikh complained that the trial court failed to follow
the punishment agreement and therefore, his waiver of the right to appeal--predicated upon the
agreement--was invalid. Consequently, Sheikh argued, he was entitled to an out-of-time appeal. 
Sheik urged that the judgment of conviction reflects the wrong date for the date of offense and
incorrectly states that he pled guilty instead of reciting that he pled not guilty but was found guilty
by a jury. The habeas court found that the judgment was inaccurate as to these two items and
concluded that relief was available through a nunc pro tunc judgment. The habeas court further
found that: (1) the agreed upon punishment was imposed by the trial court--including the omission
of a deadly weapon finding that allowed Sheikh to be eligible for community supervision; (2) (2) the
trial court's oral pronouncement of sentence was entirely consistent with the punishment agreement;
(3) Sheikh was not harmed by the judgment granting community supervision; and (4) the erroneous
judgment did not contribute to Sheikh's conviction or punishment. The habeas court concluded that
Sheikh failed to meet his burden of proving facts entitling him to relief and denied habeas corpus
relief as to this fourth ground.

 In his fifth supplemental ground for relief, Sheik asserted that the State failed to
disclose impeachment evidence to the defense: the curriculum vitae, or CV, of Dr. Edwards. At the
beginning of his cross examination of Dr. Edwards, defense counsel sought a copy of Dr. Edwards's
CV. When asked about the CV, Dr. Edwards indicated that he did not have a copy of his CV with
him but explained that he had a copy at his hotel that could be retrieved. (3) The State did not have a
copy of the CV but offered to facilitate obtaining a copy for the defense. After some discussion
about retrieving the CV, Dr. Edwards's testimony proceeded and concluded without the CV. The
next day, the doctor's office faxed a copy of the CV to the District Attorney's office which was then
delivered to the lead prosecutor but apparently not provided to defense counsel. The habeas court
found that the State suppressed the CV, that the CV was favorable evidence, and that CV was
material because it contained inconsistencies with the doctor's trial testimony that defense counsel
could have used to impeach Dr. Edwards. Accordingly, the habeas court granted relief on this
fifth ground.


D. Points of Error on Appeal

 The State appeals the habeas court's grant of relief, raising eight points of error. The
first four points of error complain that the habeas court erred in granting relief based upon the State's
purported use of perjured testimony of Dr. Edwards concerning his position at the Ben Taub
emergency room. The State's first and second points of error assert that the trial court erred because
Sheikh failed to establish that the State knowingly used perjured testimony in violation of his federal
right to due process or his state right to due course of law. The State's third point of error argues that
the habeas court impermissibly granted relief based upon a negligence standard. The State's fourth
point of error asserts that the habeas court erroneously concluded that the complained-of testimony
was material evidence.

 The State's last four points of error contend that the habeas court erred in granting
relief based upon Sheikh's claim that the State suppressed Dr. Edwards's curriculum vitae. In its
fifth and sixth points of error, the State argues that the trial court erred because Sheikh waived this
claim at trial and that the claim was barred by the estoppel doctrine. In its seventh point of error, the
State complains that the habeas court erred in concluding that the CV had value as impeachment
evidence. Finally, the State asserts in its eighth point of error that the habeas court erred in
concluding that the CV was material evidence.

 In a single point of error on cross appeal, Sheikh argues that the habeas court abused
its discretion in denying relief on his fourth ground for relief. He maintains that the trial court failed
to follow the punishment agreement and therefore, his waiver of appeal was invalid. Thus, he
contends that the habeas court erred in denying him an out-of-time appeal.


STANDARD OF REVIEW

 In reviewing a trial court's decision on a habeas corpus application, we review the
facts in the light most favorable to the trial court's ruling and, absent an abuse of discretion, uphold
the ruling. Ex parte Wheeler, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006). We afford almost total
deference to the trial court's factual findings when supported by the record, especially when those
findings are based upon credibility and demeanor. Ex parte Amezquita, 223 S.W.3d 363, 367 (Tex.
Crim. App. 2006). When the record contains findings of fact, we defer to the findings if the record
supports them. Ex parte Thompson, 153 S.W.3d 416, 417-18 (Tex. Crim. App. 2005).

 In conducting our review, we afford almost total deference to trial court's application
of law to the facts if the resolution of the ultimate question turns on an evaluation of credibility and
demeanor. See Ex parte Peterson, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003), overruled on other
grounds by Ex parte Lewis, 219 S.W.3d 335 (Tex. Crim. App. 2007). However, a deferential abuse
of discretion review is not appropriate in the context of the application of law to facts when the
trial court's decision does not turn on the credibility or demeanor of witnesses. Ex parte Martin,
6 S.W.3d 524, 526 (Tex. Crim. App. 1999). When the trial judge is not in an appreciably better
position than the reviewing court, a de novo review by the appellate court is appropriate. Id. (citing
Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)); Ex parte Franklin, 310 S.W.3d 918,
921 (Tex. App.--Beaumont 2010, no pet.). Finally, when the resolution of the ultimate question
turns on application of legal standards, we review the determination de novo. Peterson, 117 S.W.3d
at 819.


DISCUSSION

I. False Testimony Claim

 The habeas court found that Dr. Edwards made false or misleading statements when
he testified that he served as the chief of the Ben Taub emergency room. The habeas court ultimately
concluded that these statements were material. In its fourth point of error, the State challenges that
conclusion and, consequently, the habeas court's grant of relief on ground one.


A. Use of False Testimony

 A conviction procured through the use of false testimony is a denial of the due
process guaranteed by the Federal Constitution. Napue v. Illinois, 360 U.S. 264, 269 (1959);
Mooney v. Holohan, 294 U.S. 103, 112-13 (1935); Ex parte Ghahremani, 332 S.W.3d 470, 477
(Tex. Crim. App. 2011). A due-process violation may arise not only through false testimony elicited
by the State, but also by the State's failure to correct testimony it knows to be false. Ghahremani,
332 S.W.3d at 477; Estrada v. State, 313 S.W.3d 274, 288 (Tex. Crim. App. 2010) (citing Napue,
360 U.S. at 269). "It does not matter whether the prosecutor actually knows that the evidence is
false; it is enough that he or she should have recognized the misleading nature of the evidence." 
Ghahremani, 332 S.W.3d at 477 (quoting Duggan v. State, 778 S.W.2d 465, 468-69 (Tex.
Crim. App. 1989)). Thus, due process may be violated by a prosecutor's unknowing use of
perjured testimony. Ex parte Napper, 322 S.W.3d 202, 242 (Tex. Crim. App. 2010); Ex parte
Chabot, 300 S.W.3d 768, 771-72 (Tex. Crim. App. 2009).

 The case law in this area frequently refers to perjured testimony; however, there
is no requirement that the offending testimony be criminally perjurious. Ex parte Robbins,
360 S.W.3d 446, 460 (Tex. Crim. App. 2011), cert. denied, 132 S.Ct. 2374 (2012); Ghahremani,
332 S.W.3d at 477. The rules are not aimed at preventing the crime of perjury but are designed to
ensure that the defendant is convicted and sentenced on truthful testimony. Ghahremani,
332 S.W.3d at 477-78. Thus, it is sufficient that the witness's testimony is false or gives the trier
of fact a false impression. Robbins, 360 S.W.3d at 460; Ghahremani, 332 S.W.3d at 477; see Napue,
360 U.S. at 269; see also Alcorta v. Texas, 355 U.S. 28, 31 (1957) (due process violated where
witness gave jury "false impression" by testifying that he did not "love" victim and had not been on
any "dates" with victim, but omitted fact that he had had sexual intercourse with victim on several
recent occasions).

 To constitute a due-process violation, the testimony used by the State must have been
false and it must have been material to the defendant's conviction, meaning "there is a reasonable
likelihood that the false testimony could have affected the judgment of the jury." Robbins,
360 S.W.3d at 459-60 (citing United States v. Agurs, 427 U.S. 97, 103-04 (1976); Ghahremani,
332 S.W.3d at 478). To obtain relief for the unknowing use of false testimony, the habeas applicant
must prove by a preponderance of the evidence that the error contributed to his conviction or
punishment. Napper, 322 S.W.3d at 242; see Chabot, 300 S.W.3d at 771 (quoting Ex parte Fierro,
934 S.W.2d 370, 374 (Tex. Crim. App. 1996)).


B. The Testimony of Dr. Edwards

 When Dr. Edwards testified at trial, the following exchange took place when the
prosecutor asked Dr. Edwards about his prior medical training and experience:


 Q. Was this the first time you have worked in an emergency room?

 

 A. No. I worked in emergency rooms for my entire training period, as well as
I was the chief of Ben Taub Emergency Room which is the fourth busiest
trauma hospital in the United States. And then, I worked for a number of
years at Huntsville on a particular basis in the emergency room. And at
Baylor there was no emergency room doctor program, so the surgeons cover
the emergency room. So we have complete training in emergency
management.

 

 Q. Ben Taub is the trauma center in Houston, Texas.

 

 A. It covers the entire metro Houston area.

 

 Q And how long -- what was your position there?

 

 A. I was the chief of the emergency room at Ben Taub covering the entire trauma
component of Harris County or Houston.

 

 Q. What does it mean to be chief?

 

 A. I was responsible for the treatment of all patients who were triaged into the
emergency room which could be up to 200 a day, 200, 300 patients a day for
24-hour period shifts.


 At the writ hearing, Dr. Kenneth Mattox, chief of surgery and chief of staff at the Ben
Taub General Hospital, testified that while there is no official title that is "chief of the emergency
room of Ben Taub Hospital," the term chief is often used to refer to the individual who is in control
of the emergency center minute by minute. That person is the chief resident. He further testified that
one of the requirements of the chief resident assigned to the emergency center is that he sign off on
every patient seen in the emergency room, which could be up to 200 patients. (4) Dr. Mattox also
testified that the chief resident was the person who would be in control of the flow of patients, the
work-up of patients, and the minute-to-minute operation of the emergency room. Consequently, the
record reflects that Dr. Edwards conveyed accurate information about his responsibilities in the Ben
Taub Emergency Center.

 While concluding that the statements about his position were false or misleading, the
habeas court found that the term "chief" was commonly used to refer to a chief resident. The court
also found that Dr. Edwards was a chief resident and that he worked in the Ben Taub emergency
room and was responsible for the treatment of all patients who were triaged into that emergency
room. Thus, the findings of habeas court also reflect that the description of duties that Dr. Edwards
provided to the jury--"covering the entire trauma component"--was in fact accurate.


C. Materiality of Testimony

 In order to obtain relief based upon Dr. Edwards's testimony which the habeas court
found to be false or misleading, the testimony must have been material to Sheikh's conviction. 
Sheikh must demonstrate a reasonable likelihood that Dr. Edwards's referring to himself as the
"chief of Ben Taub emergency room" instead of "emergency center surgery chief" or "chief surgical
resident" could have affected the judgment of the jury. See Agurs, 427 U.S. at 103-04; Ghahremani,
332 S.W.3d at 478. We do not find that Sheikh met this burden. Although Dr. Edwards may have
referred to himself by the technically inaccurate term used within the medical profession, he
accurately informed the jury about his responsibilities and duties. We do not believe the inaccurate
or incomplete phrasing of his title contributed to Sheikh's conviction. Thus, we find that this
testimony was not material.

 Accordingly, we find that the habeas court erred in concluding that Dr. Edwards's
statements about his position at the Ben Taub Emergency Center were material and that the State's
use of this testimony denied Sheikh due process and due course of law. We further find that the
habeas court abused its discretion in granting habeas relief upon this ground. We sustain the State's
fourth point of error. (5)


II. Suppressed Evidence Claim

 The habeas court found that the State failed to disclose the curriculum vitae of
Dr. Edwards to the defense and, further, that the CV had impeachment value because it failed to
contain facts that were inconsistent with the doctor's testimony at trial. The habeas court concluded
that the suppressed CV was both favorable and material. In its eighth point of error, the State
challenges that conclusion and, therefore, the habeas court's grant of relief on ground five.


A. Brady/Bagley Violation

 Due process requires the prosecution to disclose exculpatory and
impeachment evidence to the defense that is material to either guilt or punishment. Ex parte Reed,
271 S.W.3d 698, 726 (Tex. Crim. App. 2008); see Brady v. Maryland, 373 U.S. 83, 87 (1963);
United States v. Bagley, 473 U.S. 667, 676 (1985). To succeed in showing a due-process violation
for the suppression of evidence, a defendant must show that: (1) the evidence is favorable to the
accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the State, either
inadvertently or willfully; and (3) the suppression of the evidence resulted in prejudice. Reed,
271 S.W.3d at 726; see Pena v. State, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011) (quoting
Hampton v. State, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002)).


 1. Duty to Disclose

 A prosecutor's duty to reveal exculpatory evidence to the defense attaches when the
information comes into the State's possession. Harm v. State, 183 S.W.3d 403, 407 (Tex. Crim.
App. 2006). "Brady and its progeny do not require prosecuting authorities to disclose exculpatory
information to defendants that the State does not have in its possession and that is not known to
exist." Pena, 353 S.W.3d at 810 (quoting Hafdahl v. State, 805 S.W.2d 396, 399 n.3 (Tex. Crim.
App. 1990)). Further, the State does not have a duty to disclose if the defendant was actually aware
of the exculpatory evidence or could have accessed it from other sources. Pena, 353 S.W.3d at 810;
see Harm, 183 S.W.3d at 407; Havard, 800 S.W.2d 195, 204-05 (Tex. Crim. App. 1989).


 2. Favorable Evidence

 To succeed on a Brady/Bagley claim, an appellant must show that the evidence
withheld by the State was "favorable" to his case. Pena, 353 S.W.3d at 811. Favorable evidence
is that which, if disclosed and used effectively, "may make the difference between conviction and
acquittal." Id. (quoting Bagley, 473 U.S. at 676). Favorable evidence includes exculpatory evidence
as well as impeachment evidence. Bagley, 473 U.S. at 676; Pena, 353 S.W.3d at 811. "Exculpatory
evidence is that which may justify, excuse, or clear the defendant from alleged guilt, whereas
impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence." 
Pena, 353 S.W.3d at 811-12; Harm, 183 S.W.3d at 408; Thomas v. State, 841 S.W.2d 399, 404 (Tex.
Crim. App. 1992).


 3. Materiality

 Nondisclosure of favorable evidence violates due process only if it is "material" to
guilt or punishment. Pena, 353 S.W.3d at 812. Materiality, as incorporated into the third prong, is
a requirement that a defendant must be prejudiced by the State's failure to disclose the favorable
evidence. Banks v. Dretke, 540 U.S. 668, 691 (2004). "The mere possibility that an item of
undisclosed information might have helped the defense, or might have affected the outcome of the
trial, does not establish 'materiality' in the constitutional sense." Pena, 353 S.W.3d at 812 (quoting
Agurs, 427 U.S. at 109-10); see Webb v. State, 232 S.W.3d 109, 114-15 (Tex. Crim. App. 2007)
(quoting Hampton, 86 S.W.3d at 612). As the Court of Criminal Appeals articulated:


 The question is not whether the defendant would more likely than not have received
a different verdict with the evidence, but whether in its absence he received a fair
trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable
probability" of a different result is accordingly shown when the [State's] evidentiary
suppression "undermines confidence in the outcome of the trial."

 


Pena, 353 S.W.3d at 812 n.11 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)); see Bagley,
473 U.S. at 682 (citing Strickland, 466 U.S. at 694). "Hence, the defendant must show that, 'in light
of all the evidence, it is reasonably probable that the outcome of the trial would have been different
had the prosecutor made a timely disclosure.'" Pena, 353 S.W.3d at 812 (quoting Hampton,
86 S.W.3d at 612); see Bagley, 473 U.S. at 682.

 Materiality depends on the circumstances of the particular case and the evidence as
a whole. Webb, 232 S.W.3d at 114. When evaluating whether the materiality standard is satisfied,
the strength of the exculpatory evidence is balanced against the evidence supporting conviction.
Pena, 353 S.W.3d at 812; Hampton, 86 S.W.3d at 613. The suppressed evidence is considered
collectively, rather than item-by-item. Pena, 353 S.W.3d at 812; see Kyles, 514 U.S. at 436.


B. The Suppressed Curriculum Vitae

 At the beginning of his cross-examination of Dr. Edwards, defense counsel asked the
doctor for his curriculum vitae. Dr. Edwards, however, had not brought a copy of his CV with him
to the courtroom but had one with his luggage at his hotel. After a brief discussion among the
prosecutor, defense counsel, the doctor, and the court about possibly retrieving the CV, defense
counsel conducted his cross-examination of the doctor--without the CV. At the conclusion of the
doctor's testimony, approximately seven minutes after the discussion about retrieving the CV, there
was a question from the court about needing "that" to which defense counsel stated "No." (6) The next
morning, outside the presence of the jury, the court asked the State if it had, or had ever received,
the CV of Dr. Edwards. The second chair prosecutor responded that she thought the defense had
decided they did not want the CV and that she did not think the State had obtained a copy of the CV
from Dr. Edwards. Defense counsel, both present during this exchange, remained silent and never
indicated otherwise. (7) Later that morning, an employee from Dr. Edwards's office faxed a copy of
the doctor's CV to the District Attorney's office. Shortly after receiving the fax, the victim services
coordinator brought it over to the lead prosecutor while the guilt-innocence phase of trial was still
in progress. The record contains conflicting testimony about whether the defense was informed
about the receipt of the faxed CV.

 During their testimony at the writ hearing, both prosecutors indicated that they
understood the exchange between the court and defense counsel at the conclusion of Dr. Edwards's
testimony to mean that the defense was no longer interested in obtaining the CV. Lead defense
counsel testified that he did not know what he and the judge were referring to during that exchange,
but co-counsel conceded the exchange could very well have been about the CV. The lead prosecutor
also indicated that she believed she had turned the CV over to defense counsel after receiving it from
the victim services coordinator although both defense attorneys testified that the State never made
them aware that the State had received a faxed copy of the CV.

 The habeas court made no specific findings about the exchange that took place at the
conclusion of Dr. Edwards's testimony--what the exchange referred to, whether defense counsel had
ceased requesting the CV, or whether the prosecutors understood that they no longer had to obtain
the CV. However, when finding that the State suppressed the CV, the habeas court did find that the
lead prosecutor was not credible and the defense attorneys were credible. (8) The habeas court also
found that the State did not disclose the CV to defense counsel during trial.

 The habeas court made a specific finding that the CV was favorable because the
inconsistencies between the CV and Dr. Edwards's trial testimony could have been used to impeach
Dr. Edwards. These inconsistencies arose not from what the CV contained, but rather from 
information that was not included in the CV. The habeas court described three inconsistencies: 
(1) Dr. Edwards testified about moonlighting at Huntsville Memorial Hospital, but did not list this
moonlighting experience on his CV; (2) Dr. Edwards did not list Huntsville Memorial Hospital on
his CV among the hospitals where he had worked; and (3) Dr. Edwards testified that he was chief
of the Ben Taub Emergency Center, but does not list that position or employment on his CV. 
Characterizing this case as a battle between experts, the habeas court concluded that the CV was
material because the defense did not have an opportunity to use the information missing from the
CV to impeach Dr. Edwards, the State's expert.


C. Materiality of Evidence

 In order to obtain relief based upon the suppression of Dr. Edwards's CV, Sheikh
must demonstrate that the suppression of the CV resulted in prejudice. He must show that, in light
of all the evidence, it is reasonably probable that the outcome of the trial would have been different
had the State provided Dr. Edwards's CV to defense counsel. See Bagley, 473 U.S. at 682; Pena,
353 S.W.3d at 812. However, the mere possibility that the undisclosed CV might have helped the
defense impeach Dr. Edwards, or even might have affected the outcome of the trial, does not
establish materiality in the constitutional sense. See Pena, 353 S.W.3d at 812; Webb, 232 S.W.3d
at 114-15. The question is whether Sheikh established that the State's failure to disclose the CV
undermines confidence in the outcome of the trial. (9) See Bagley, 473 U.S. at 682; Pena, 353 S.W.3d
at 812 n.11.

 In reviewing the record, even deferring to the findings of fact made by the habeas
court, we do not find that Sheikh met his burden of demonstrating prejudice. When evaluating the
materiality of suppressed evidence, we must balance the strength of the impeachment evidence
against the evidence supporting conviction. See Pena, 353 S.W.3d at 812; Hampton, 86 S.W.3d
at 613.


 1. Evidence Supporting Conviction

 The indictment in this case charged Sheikh with aggravated assault by causing bodily
injury to Beth by choking her and using his hands as a deadly weapon. The evidence supporting
Sheikh's conviction--that is, evidence demonstrating bodily injury resulting from strangulation and
the use of a deadly weapon--came from multiple sources, not just from Dr. Edwards. (10)

 First, the evidence of strangulation and bodily injury came from the testimony of
multiple witnesses as well as photographic evidence. Beth testified about the parking garage
strangulation incident where Sheikh painfully choked her until she lost consciousness. She identified
the bruises on her neck in the photographs admitted into evidence as the injuries resulting from Sheik
grabbing her around her neck and choking her. In addition, the victim services counselor for the
Austin Police Department as well as two of Beth's friends testified that they saw the bruises on
Beth's neck after the assault. Further, one of the police detectives testified that he saw the bruises
and, based upon his law enforcement experience, the bruises looked like hand prints or fingerprints. 
Finally, another detective testified about the bruising about Beth's neck area as well as the fact that
her voice was raspy.

 Second, the evidence supporting the finding that Sheikh used his hands as a deadly
weapon also came from multiple sources excluding Dr. Edwards. Again, Beth identified her injuries
in the photographs admitted before the jury. She testified that she could not breathe and that she lost
consciousness when Sheikh choked her. She also described the brief paralysis that followed the
strangulation. Her testimony alone is enough to support the jury's deadly weapon finding. 
See English v. State, 647 S.W.2d 667, 668-69 (Tex. Crim. App. 1983) (either expert or lay
testimony may be sufficient to support deadly weapon finding by jury); see also Tucker v. State,
274 S.W.3d 688, 691-92 (Tex. Crim. App. 2008) ("Even without expert testimony or a description
of the weapon, the injuries suffered by the victim can by themselves be a sufficient basis for inferring
that a deadly weapon was used."). In addition, one of the detectives testified that based upon his law
enforcement experience with other strangulation cases, he believed that Sheikh's hands were used
as a deadly weapon in this case. See Tucker, 274 S.W.3d at 691-92 (citing Hawkins v. State,
605 S.W.2d 586, 588 (Tex. Crim. App. 1980)) (police officers can be expert witnesses with respect
to whether deadly weapon was used).

 The habeas court concluded that Dr. Edwards's expert medical opinion about
strangulation being the cause of the Beth's injuries was crucial to the State's case. But, under the
indictment in this case, the State merely had to prove that Sheik caused bodily injury to Beth and that
he used a deadly weapon. Neither of these elements required expert medical testimony. It does not
take medical expertise to recognize that choking a person to the point that she loses consciousness
and suffers bruising on her neck may be sufficient to constitute bodily injury. See Tex. Penal Code
Ann. § 1.07(a)(8) (West 2011) ("bodily injury" means "physical pain . . . or impairment of physical
condition" ); Laster v. State, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009) (The broad definition of
bodily injury "encompasses even relatively minor physical contact if it constitutes more than
offensive touching. Direct evidence that a victim suffered pain is sufficient to show bodily injury.")
(internal citations omitted). In addition, the evidence--without any medical expert
testimony--demonstrated that Sheikh's hands in the manner of their use in choking Beth were
capable of causing serious bodily injury or death. See Tucker, 274 S.W.3d at 691 (citing McCain
v. State, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000)) (State not required to prove deadly weapon
caused death or serious bodily injury, only that object, in manner of its use or intended use, was
capable of causing death or serious bodily injury) (emphasis in original). It does not take expert
medical testimony to recognize that the inability to breathe could easily place Beth's life in jeopardy.

 The overall evidence presented--from Beth, her friends, the detectives, the medical
records, and the photographic evidence--strongly supports Sheikh's conviction.

 2. The Impeachment Evidence

 The habeas court found that the impeachment value of the CV derived from
information the CV failed to contain. These omissions--characterized as inconsistencies by the
habeas court--were not, however, the strongest impeachment evidence. The failure to list
moonlighting work, the hospital at which that moonlighting work was done, or his position as chief
surgery resident of the Ben Taub Emergency Center on his resume simply does not provide strong
impeachment material with regard to Dr. Edwards's training and ER experience as a medical doctor. 
The habeas court concluded that the State suppressed the CV in order to heighten Dr. Edwards's
credentials, but the failure to include the noted information does not detract from or conflict with the
doctor's credentials as he presented them to the jury in his testimony. When the prosecutor asked
about his training, Dr. Edwards testified that he had 15 years of medical training after college. 
Dr. Mattox testified at the writ hearing that Dr. Edwards's CV reflected anywhere from 14 to 19
years of medical training. Further, Dr. Mattox indicated that to discover the full extent of
Dr. Edwards's training you would have to ask Dr. Edwards directly because that information could
not be discerned from the CV alone. With regard to his experience working in emergency rooms,
Dr. Edwards testified that he worked in emergency rooms for his entire training period. Dr. Mattox
testified at the writ hearing that this statement was a true statement based upon Dr. Edwards's CV. 
Thus, the CV did not contradict Dr. Edwards's trial testimony about his medical training
and experience.

 Further, the inconsistencies noted by the habeas court do not impugn Dr. Edwards's
testimony regarding his training and experience. While it is true that the CV does not list any
moonlighting work, this omission creates minimal, if any, impeachment opportunity. In fact, this
information provides further evidence of Dr. Edwards's medical experience, possibly enhancing, not
diminishing, his expert status. Similarly, the failure of the CV to reflect employment at Huntsville
Medical Hospital does not generate strong impeachment material. The CV does not list any
employment at all. Rather, the hospitals where Dr. Edwards worked are listed under the "Academic
Record" section where he lists the hospitals affiliated with his residency. His moonlighting work
at Huntsville Memorial Hospital was not affiliated with his residency. Therefore, this information
was appropriately not included in this section of the CV. Dr. Mattox explicitly testified that none
of the information on Dr. Edwards's CV concerning his residency experience appeared to
be incorrect.

 The habeas court emphasized the importance of Dr. Edwards's testimony--and
therefore the importance of his CV for impeachment purposes--because of the testimony of two
other medical experts. First, the ER doctor who examined Beth the previous day after the dorm
room strangulation assaults testified that he did not see any injuries on her. Second, the defense had
an expert who concluded, after reviewing the photographs of the victim, that Beth's injuries did not
result from strangulation. Because of their testimony, the habeas court concluded that Dr. Edwards
was the only witness who found Beth's injuries consistent with her description of being choked. 
However, the testimony of Beth's friends, the victim services coordinator, and the two
detectives--including the one who recognized the bruises as being in the pattern of fingerprints, all
corroborate the strangulation assault Beth described. In addition, the photographs of the bruises on
Beth's neck further corroborate Beth's account of the assault. Thus, Dr. Edwards's medical opinion
was not the crucial evidence the habeas court found it to be.

 The habeas court opined that it was critical for the State to demonstrate that
Dr. Edwards was proficient and knowledgeable in emergency room medicine. (11) Thus, the court
reasoned that the fact that the CV failed to list his position of chief of the Ben Taub Emergency
Center provided an opportunity for impeachment to attack Dr. Edwards's credentials. However, as
we noted previously, while the title Dr. Edwards used may have been technically inaccurate or
incomplete, his description of his duties and responsibilities was entirely accurate. He correctly
conveyed his responsibilities and medical experience at the Ben Taub Emergency Center. Thus,
because Dr. Edwards accurately described the responsibilities he had, any inconsistency between the
title used within the medical community and the technically correct title provided only limited
impeachment material. 

 We conclude that the CV had very little, if any, impeachment value. Accordingly,
when balancing the weakness of the impeachment evidence against the strength of the evidence
supporting conviction, we conclude that the CV was not material. For that reason we find that the
habeas court erred in concluding that the State's suppression of Dr. Edwards's curriculum vitae
denied Sheikh due process and due course of law. We hold that the habeas court abused its
discretion in granting habeas relief upon this ground and sustain the State's eighth point of error. (12) 

III. Out-of-Time Appeal

 In his sole point of error on cross appeal, Sheikh argues that the habeas court abused
its discretion in denying relief upon the fourth ground asserted in his habeas corpus application in
which he claimed that his waiver of appeal was invalid because the trial court failed to follow the
punishment agreement.


A. Claim Not Cognizable

 Article 11.072 describes the procedure for an applicant who seeks relief from an order
or judgment of conviction ordering community supervision. See Tex. Code Crim. Proc. Ann. art.
11.072, § 1. The applicant must be, or have been, on community supervision. Id. art. 11.072, § 2(b). 
In addition, the application must challenge the legal validity of: (1) the conviction for which
community supervision was imposed or the order imposing community supervision; or (2) the
conditions of community supervision on constitutional grounds. Id. art. 11.072, §§ 2(b), 3(c). Thus,
the statute authorizes the trial court to grant relief from a judgment of conviction for community
supervision or an order imposing community supervision only when the applicant asserts the
above-described challenges. See id. art. 11.072, § 1.

 Sheikh complained in his fourth ground for habeas corpus relief that he was denied
his right to appeal. The relief sought reveals the nature of his claim. Sheikh sought an out-of-time
appeal. He did not challenge the legal validity of his conviction by the jury--the conviction for
which community supervision was imposed--but merely sought a means to subsequently challenge
the legal validity of that conviction. Nor did Sheikh challenge the legal validity of the order in which
community supervision was imposed. In fact, Sheikh asserts in his brief that his claim before the
habeas court "never challenged the lawfulness of his sentence or the manner in which he was granted
community supervision." In his fourth ground for relief, Sheikh did not challenge the legal validity
of the judgment of conviction at all but rather asserted that the errors in the judgment demonstrated
a denial of his right to appeal. Sheikh's complaint about the denial of his right to appeal is not a
valid claim under article 11.072.

 Because Sheikh's claim failed to challenge the legal validity of his aggravated assault
conviction or the order imposing community supervision, we find that Sheikh's claim is not
cognizable on an application for habeas corpus relief under article 11.072. Accordingly, we find that
the habeas court did not abuse its discretion in denying relief.


B. The Punishment Agreement

 Nevertheless, assuming arguendo the claim asserted in Sheikh's fourth ground was
cognizable, the habeas court did not abuse its discretion in denying relief because Sheikh was not
denied his right to appeal. The record reflects that his waiver of appeal was valid because the trial
court followed the negotiated punishment agreement.

 At trial, after the jury returned the verdict of guilty, the State and defense reached an
agreement as to punishment. Pursuant to the punishment agreement, Sheikh withdrew his election
for the jury to assess punishment and waived his right to appeal. The trial court refrained from
entering a deadly weapon finding and Sheikh was granted a suspended sentence and placed on
community supervision.

 Sheikh asserts that errors in the judgment of conviction reflect that the trial court
judge failed to follow the punishment agreement. He argues that the failure to follow the agreement
rendered his waiver of his right to appeal, predicated upon the punishment agreement, invalid. Thus,
he contends, he is entitled to an out-of-time appeal.

 The habeas court found that the trial court's judgment of conviction was inaccurate
in two ways: (1) the judgment incorrectly reflects that Sheik pled guilty when he actually pled not
guilty but was found guilty by the jury, and (2) the judgment erroneously reflects an offense date of
May 13, 2005 instead of May 14, 2005.

 Sheikh argues that these errors in the judgment reveal that the trial court judge did
not punish him for the offense for which the jury found him guilty (the parking garage strangulation
assault) but, unbeknownst to him, actually punished him for an extraneous aggravated assault offense
(one of the dorm room strangulation assaults). (13) He claims that the judgment of conviction was
intentionally entered by the trial court judge--without the parties' knowledge or consent--in an
effort to void the effect of the jury's affirmative deadly weapon finding. (14) However, the habeas court
found that the sentence assessed by the trial judge's oral pronouncement was completely consistent
with the agreement reached by the parties.

 A trial court's pronouncement of sentence is oral, while the judgment, including the
sentence assessed, is merely the written manifestation of that oral pronouncement. Taylor v. State,
131 S.W.3d 497, 500 (Tex. Crim. App. 2004); Keys v. State, 340 S.W.3d 526, 527 (Tex.
App.--Texarkana 2011, no pet.); see State v. Davis, 349 S.W.3d 535, 538 (Tex. Crim. App. 2011). 
When the court's written judgment differs from the court's oral pronouncement of sentence, the oral
pronouncement controls. Ex parte Huskins, 176 S.W.3d 818, 820 (Tex. Crim. App. 2005); Ex parte
Madding, 70 S.W.3d 131, 135 (Tex. Crim. App. 2002); Aguilar v. State, 279 S.W.3d 350, 354 (Tex.
App.--Austin 2007, no pet.). The rationale behind this rule is that all of the parties are physically
present at the sentencing hearing and able to hear and respond to the imposition of sentence in the
oral pronouncement. Davis, 349 S.W.3d at 539; Madding, 70 S.W.3d at 135. Therefore, "it is the
pronouncement of sentence that is the appealable event, and the written sentence or order simply
memorializes it and should comport therewith." Madding, 70 S.W.3d at 135 (quoting Coffey
v. State, 979 S.W.2d 326, 328 (Tex. Crim. App. 1998)); Keys, 340 S.W.3d at 527.

 In this case, the oral pronouncement of sentence by the trial court at Sheikh's
sentencing was consistent with the negotiated punishment agreement. The record of the sentencing
clearly reflects that both parties and the judge all understood the ten-year suspended sentence to be
the punishment for the offense for which the jury had just found Sheikh guilty. Consequently, the
errors in the judgment are simply clerical errors, not judicial errors as Sheikh claims. The proper
remedy in a situation where the written judgment differs from the oral pronouncement of sentence
is to modify the trial court's judgment to match the oral pronouncement. Madding, 70 S.W.3d at
137; Aguilar, 279 S.W.3d at 354. 

 Sheikh contends in his cross-appeal point of error that the habeas court failed to
address his claim but instead reframed it. He argues that he complained about the invalid waiver of
appeal but the habeas court addressed the illegality of the sentence imposed instead. However, while
the court discussed the illegality of the sentence, (15) the court's findings and conclusions directly
address Sheikh's complaint about the purported failure to follow the punishment agreement. The
habeas court explicitly found that, contrary to Sheik's claim, the trial court did in fact follow the
punishment agreement Sheikh negotiated with the State. The court explicitly rejected the premise
underlying the claim of an invalid waiver of appeal and, therefore, implicitly rejected this claim. 
Thus, the habeas court implicitly found that Sheikh's waiver of appeal was valid.

 The record supports the habeas court's explicit finding that the trial court followed
the punishment agreement and, thus, the court's implicit finding that Sheikh's waiver of appeal in
reliance upon that agreement was valid. Accordingly, the habeas court did not abuse its discretion
in denying relief upon Sheikh's fourth ground for relief. We overrule the sole point of error in
Sheikh's cross-appeal. (16)

CONCLUSION


On the State's Appeal

 Upon review of the record, we conclude that neither the incomplete title used by
Dr. Edwards in his testimony nor the suppressed curriculum vitae were material. Accordingly, the
habeas court abused its discretion in granting habeas relief on grounds one and five of Sheikh's
application for writ of habeas corpus. We sustain the State's fourth and eighth points of error. The
habeas court's order is reversed as to grounds one and five and judgment is rendered denying the
application for writ of habeas corpus. The trial court's judgment of conviction is reinstated.


On Sheikh's Cross Appeal

 Sheikh's complaint about the denial of his right to appeal is not a claim cognizable
on an 11.072 writ. Moreover, the record supports the habeas court's findings and conclusion that
the trial court followed the punishment agreement at sentencing. Therefore, Sheikh's waiver of
appeal was valid and he is not entitled to an out-of-time appeal. For these reasons, the habeas court
did not abuse its discretion in denying relief on the fourth ground for relief asserted in Sheikh's
application for writ of habeas corpus. We overrule Sheikh's sole point of error on cross appeal. The
habeas court's order denying habeas corpus relief on ground four of Sheikh's application for writ of
habeas corpus is affirmed.



 __________________________________________

 Melissa Goodwin, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed in part; Reversed and Rendered in part

Filed: August 17, 2012

Do Not Publish

1. Apparently, Sheikh filed a first supplemental application in November 2007 that simply
expanded on the four grounds raised in the original application. This first supplemental application
is not contained in the record on appeal.
2. The jury convicted Sheikh of aggravated assault "as alleged in the indictment." The
aggravating factor alleged in the indictment was the use of a deadly weapon during the assault. The
jury also returned an affirmative answer to a separately submitted question about the use of a deadly
weapon. The affirmative deadly weapon finding rendered Sheikh ineligible for judge-ordered
community supervision. See Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp. 2012). 
Arguably, Sheikh was still not eligible for community supervision even with the court omitting the
jury's affirmative deadly weapon finding since the offense itself--aggravated assault with a deadly
weapon--contained a deadly weapon finding. Nevertheless, the punishment agreement involved the
deletion of the deadly weapon finding in order to place Sheikh on community supervision.
3. The record reflects that Dr. Edwards had moved to California prior to trial and had traveled
back to Texas to testify.
4. Dr. Mattox stated that at times the Ben Taub Emergency Center has had as many as 350 to
400 patients a day and, at the time of the writ hearing, had 200 to 300 patients per day.
5. Because we sustain this point of error, we do not address the other three points of error
complaining about the habeas court's grant of relief on ground one. See Tex. R. App. P. 47.1.
6. The following occurred at the end of defense counsel's cross examination of Dr. Edwards:



 [DEFENSE COUNSEL]: I think that's clear enough. We pass the witness.

 

 [PROSECUTOR]: We have no further questions for the witness.

 

 THE COURT: Do we need that?

 

 [DEFENSE COUNSEL]: No.

 

 [PROSECUTOR]: Well --


 [DEFENSE COUNSEL]: I think it is clear.



The prosecutor then asked for a brief recess to work with the witness to retrieve his luggage but the
court advised the State to move on to the next witness and the proceedings continued.
7. Both defense attorneys remained silent during the following exchange:



 THE COURT: Does the State have a C.V. for this witness? Did you ever get the one
for yesterday's witness, the doctor?

 

 [PROSECUTOR]: I don't know what the --

 

 THE COURT: Do you ever get the --

 

 [PROSECUTOR]: -- if they decided to not want it.

 

 THE COURT: You didn't even get a copy of it? I was curious.

 

 [PROSECUTOR]: I don't know. I don't think so.
8. The court made no findings about the credibility of the second chair prosecutor.
9. The State's suppression of the CV could only have begun upon receipt of the faxed CV
from Dr. Edwards's office because only then would the impeachment evidence--the inconsistencies
from the information missing on the CV--have come into the State's possession or knowledge. See
Harm v. State, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006). We note that the record reflects that
the State received the faxed CV the day after Dr. Edwards testified. The record does not indicate
whether Dr. Edwards returned to California after his testimony, although it does reflect that at the
conclusion of his testimony he intended to retrieve his luggage from his hotel. This suggests that
Dr. Edwards was no longer in Texas when the State received the faxed copy of his CV the day after
he testified.
10. Dr. Edwards testified as a fact witness about the injuries he observed on the victim at the
time he treated her in the emergency room. These observations were documented in the medical
records admitted at trial.
11. We note, however, that the record reflects that the State did not emphasize Dr. Edwards's
credentials during jury argument at all but only addressed them in response to defense counsel's
attack of the doctor's credentials in his closing argument.
12. Because we sustain this point of error, we do not address the other three points of error
related to the habeas court's grant of relief on ground five. See Tex. R. App. P. 47.1.
13. The record reflects that while some abusive conduct occurred Friday evening and during
their discussions throughout the night, the dorm room strangulation assaults--in the bathroom, on
the bed, and on the bed with the pillow case--all occurred on May 14, 2005. Sheikh does not
explain how this May 13, 2005 date correlates to an extraneous strangulation offense that occurred
in the dorm room other than to simply assert that the May 13, 2005 date refers to the Dobie incident. 
The record does not support that conclusion.
14. We note that the extraneous strangulation offenses that occurred in the dorm room would
have been aggravated assaults by virtue of Sheikh causing bodily injury to Beth and using his hands
as a deadly weapon. So, while entering a judgment of conviction for one of these assaults would
have, arguably, voided the jury's deadly weapon finding, the trial court would not have eliminated
the deadly weapon problem because the finding would still have been inherent in the offense itself: 
aggravated assault with a deadly weapon. Thus, it is difficult to discern how the trial court entered
a judgment of conviction for an extraneous offense to avoid the deadly weapon issue when doing so
did not avoid the issue.
15. The habeas court concluded that Sheikh was estopped from complaining about the
illegality of the sentence.
16. In this point of error, Sheikh also complains that the habeas court erroneously issued a
nunc pro tunc judgment. However, this claim is not properly before this Court as Sheikh never
presented this complaint to the habeas court. The nunc pro tunc judgment was issued prior to the
evidentiary hearing on his application and prior to the filing of his second supplemental application. 
However, Sheikh raises this complaint for the first time on appeal. See Tex. R. App. P.
33.1(a)(1)(A). Furthermore, this complaint is not relevant to his complaint about his purportedly
invalid waiver of appeal; thus, we do not address it. See Tex. R. App. P. 47.1, 32.1. In addition, a
defendant may appeal the trial court's entry of a nunc pro tunc judgment. See, e.g., Moore v. State,
446 S.W.2d 878 (Tex. Crim. App. 1969); Johnson v. State, 233 S.W.3d 420 (Tex. App.--Fort Worth
2007, pet. ref'd); Fanniel v. State, 73 S.W.3d 557 (Tex. App.--Houston [1st Dist.] 2002, no pet.). 
Therefore, Sheikh should have raised any complaints relating to the habeas court's alleged error in
entering the nunc pro tunc judgment via appeal of that order.